## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NADIA LOUDON, | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 3:20-CV-2060-N |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Nadia Loudon (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (docs. 1, 17). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **RESERVED**, and the case be **REMANDED** for reconsideration.

## I. BACKGROUND

On October 31, 2017, Plaintiff filed her application for DIB, alleging disability beginning on February 2, 2016. (doc. 14-1 at 75, 170.)[2] Her claim was denied initially on March 8, 2018 (*Id.* at 102), and upon reconsideration on August 21, 2018 (*id.* at 109). On September 6, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 114.) She appeared and testified at a hearing on July 24, 2019. (*Id.* at 34.) On September 25, 2019, the ALJ issued a decision finding her not disabled. (*Id.* at 14.)

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 11, 2019. (*Id.* at 168.)  The Appeals Council denied her request for review on June 3, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.)  She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

### A.    Age, Education, and Work Experience

Plaintiff was born on November 9, 1961, and was 54 years old at the time of the hearing. (doc. 14-1 at 40, 170.)  She had completed one year of college and could communicate in English. (*Id.* at 41.)  She had past relevant work as a marketing account director, a procurement services manager, an advertising manager, and a general vice president. (*Id.* at 65-66.)

### B.    Medical, Psychological, and Psychiatric Evidence

On February 11, 2016, Plaintiff presented to her primary care physician, Julie Reihsen, M.D., for evaluation of thyroid nodules. (doc. 14-1 at 314-17.) She reported feeling tired, stressed, moody, and anxious, and that she had been experiencing weight fluctuations, intermittent palpitations, facial hair growth, and hot flashes. (*Id.* at 314.) A February 15, 2016 thyroid sonogram showed a generally enlarged heterogeneous thyroid gland. (*Id.* at 318-19.)  A February 24, 2016 bilateral mammogram and breast ultrasound showed suspicious increasing clusters of microcalcifications in the upper outer quadrant in both breasts. (*Id.* at 344.)

On March 21, 2016, Plaintiff underwent a stereotactic breast biopsy procedure of lesions in the left breast. (*Id.* at 342-43.) The pathological diagnoses were fibrocystic changes, mild epithelial hyperplasia, atypical lobular hyperplasia (ALH) with ductal involvement by cells of ALH, and the findings were negative for in situ and invasive carcinoma. (*Id.* at 353.)

On April 6, 2016, Plaintiff was examined by Peter Beitsch, M.D., at Dallas Surgical Group.

2

(*Id.* at 377-80.) Review of systems and physical examination were normal, and she had an Eastern Cooperative Oncology Group (ECOG) score of Grade 0.[3] (*Id.* at 378-79.) Dr. Beitsch assessed her with ALH and recommended left needle localized lumpectomy. (*Id.* at 377.) An April 11, 2016 bilateral breast MRI showed numerous small cysts scattered within each breast but no breast malignancy. (*Id.* at 340-41.)

On April 21, 2016, Dr. Beitsch performed a left needle localized partial mastectomy and breast reconstruction. (*Id.* at 328-29.) He noted that a stereotactic core biopsy of the left mammographic abnormality revealed atypical lobular hyperplasia, requiring excision of that entire area. (*Id.* at 329.) A right breast biopsy showed breast tissue with a focus of ductal carcinoma in situ (DCIS). (*Id.* at 345-51.)

On May 17, 2016, Plaintiff met with Phillip Kovoor, M.D., at Texas Oncology for DCIS of the breast. (*Id.* at 438-40.) He noted that Plaintiff had been evaluated for radiation therapy and would begin radiation within the next month. (*Id.* at 439.) He recommended Tamoxifen as additional treatment for DCIS. (*Id.* at 439-40.) Plaintiff reported some pain with swallowing solids and liquids and was referred for gastroenterology evaluation. (*Id.* at 440.)

Plaintiff initiated radiation treatment in May 2016, and completed radiation on July 21, 2016. (*Id.* at 428.) A July 22, 2016 thyroid and parathyroid ultrasound showed multiple bilateral thyroid nodules were stable. (*Id.* at 307-08.)

On August 15, 2016, Plaintiff returned to Dr. Beitsch for a three-month breast cancer follow-up. (*Id.* at 368-71.) She reported doing well, that she had finished radiation treatment with no

---

[3]The ECOG Performance Status Scale is used by physicians to measure how cancer impacts a patient's daily living abilities. *See* ECOG Performance Status Scale, ECOG-ACRIN CANCER RESEARCH GROUP, https://www.ecog-acrin.org/resources/ecog-performance-status (last visited Mar. 5, 2022). An ECOG score of Grade 0 means the patient is fully active and able to carry on all pre-disease performance without restriction. *Id.*

complaints, and that she would seek chemotherapy consultation. (*Id.* at 368-69.) Physical examination was normal, and her ECOG score was Grade 0. (*Id.* at 369-70.)

On September 22, 2016, Plaintiff returned to Dr. Reihsen for a thyroid follow-up and to discuss sonogram results. (*Id.* at 304.) She reported swelling in the upper neck and some difficulty swallowing. (*Id.*) Dr. Reihsen noted that nodules were stable since her January 2016 sonogram, and that her symptoms were associated with lymph nodes in her neck and were consistent with their immune function. (*Id.*) She advised Plaintiff to take Prilosec consistently. (*Id.*)

On December 2, 2016, Plaintiff presented to Dr. Beitsch for a breast cancer follow-up. (*Id.* at 364-67.) She reported an increased cholesterol level and discomfort and aching in both breasts. (*Id.* at 364.) Physical examination was normal, and her ECOG score was Grade 0. (*Id.* at 366-67.)

On January 9, 2017, Plaintiff returned to Texas Oncology and was seen by nurse practitioner (NP) Claudia Clancy. (*Id.* at 415.) She reported feeling very "sluggish," that she was anxious and depressed about her cancer diagnosis and losing her job and insurance, and that she experienced night sweats, intermittent nausea, and headaches. (*Id.* at 415-16.) She agreed to start with therapy on Tamoxifen. (*Id.* at 416.) At her follow-up appointment a month later, she reported tolerating Tamoxifen well. (*Id.* at 408.)

On April 19, 2017, Plaintiff visited NP Clancy, complaining of episodic breast pain mainly in her axillary region. (*Id.* at 396.) Examination was positive for left breast pain and negative for right breast pain. (*Id.* at 397.) She also reported depression, weight gain, and musculoskeletal pain. (*Id.*) NP Clancy instructed her to stop taking Tamoxifen due to her symptoms, and scheduled her for a one-month follow-up with Dr. Kovoor. (*Id.* at 399.)

On May 18, 2017, Plaintiff presented to Dr. Kovoor, and she reported that she was feeling

4

well. (*Id.* at 391.) Dr. Kovoor noted that Plaintiff had stopped Tamoxifen due to toxicity in April 2017, and her symptoms were "overall clinically improving." (*Id.*)

On June 2, 2017, Plaintiff presented to Dr. Beitsch for a six-month cancer follow-up. (*Id.* at 360-63.) She reported a "weird feeling" in the left breast, and that she had gone to the emergency room (ER) the previous week for benign paroxysmal positional vertigo (BPPV). (*Id.* at 360.)

On June 8, 2017, Plaintiff presented to Texas Neurology Consultants and saw Daniel Hopson, M.D., for vertigo evaluation. (*Id.* at 469-71.) She reported that she developed acute vertigo, near syncope, and tinnitus, while at a store on May 25, 2017. (*Id.* at 469.) She felt nauseated with positional vertigo, had bilateral temporal head pain, and was unable to walk. (*Id.*) She went to the ER and was diagnosed with BPPV. (*Id.*) Her symptoms had improved, and she felt okay when inactive, but her symptoms increased with movement. (*Id.*) She had migraines years before, but none recently. (*Id.*) Physical examination was normal, with no significant abnormalities noted. (*Id.* at 469-70.) Dr. Hopson opined that she most likely had labyrinthitis or acute positional vertigo and that her headaches were related to tension, as she did not have all typical migraine symptoms. (*Id.* at 470.)

On June 14, 2017, Plaintiff returned to Dr. Hopson for a follow-up appointment. (*Id.* at 466-67.) She reported not being able to travel because of vertigo. (*Id.* at 466.) Dr. Hopson noted an abnormal brain MRI that showed diffuse T2 white matter signals consistent with advanced microvascular disease or demyelinating disease, but not in a pattern to produce vertigo. (*Id.* at 467.)

On July 17, 2017, a cervical spine MRI showed moderate spondylosis at C5-C6 with degenerative grade 1 retrolisthesis causing minimal spinal canal stenosis, with no effect on the spinal cord. (*Id.* at 331-32.) The cervical spinal cord was normal, and there was no evidence of foraminal stenosis. (*Id.*)  On August 11, 2017, a bilateral breast MRI showed no evidence of malignancy in

either breast. (*Id.* at 442-43.)

On August 29, 2017, Plaintiff presented to Dr. Reihsen with vertigo, chest pain, fatigue, and muscle pain. (*Id.* at 898-901.) Dr. Reihsen noted that her brain MRI was notable for vascular brain disease, but neurologists had ruled out any neurological abnormality other than vertigo. (*Id.* at 898.) She was referred for further cardiac recommendation and testing. (*Id.* at 900.)

On September 25, 2017, Plaintiff presented to NP Clancy, complaining of headaches, not sleeping well, and constant worry about cancer. (*Id.* at 386-87.) Review of systems was positive for fatigue, worry, and insomnia, but normal for everything else. (*Id.* at 387.)  NP Clancy advised Plaintiff to follow up with her primary care physician to discuss whether anxiety or depression might be the cause of her symptoms. (*Id.* at 386.)

On October 2, 2017, Plaintiff presented to Dr. Reihsen with lipid disorder and headaches. (*Id.* at 895-97.) She reported one to three headaches per week in the prior six to 12 months. (*Id.* at 895.) Dr. Reihsen diagnosed her with headaches, hyperlipidemia, and mild major depressive disorder. (*Id.* at 896.)

On October 16, 2017, Plaintiff presented to Dr. Hopson with migraines. (*Id.* at 460-63.) She reported two weeks of headaches and light headedness, as well as some nausea and light sensitivity. (*Id.* at 460.) On examination, she was anxious and upset about her light headedness and head pain, and she moved slowly due to fear of dizziness. (*Id.* at 460-61.)  Dr. Hopson assessed her with migraine without aura and without status migrainosus, head pain, and dizziness. (*Id.* at 461.)

On October 24, 2017, Plaintiff returned to Dr. Hopson for follow-up. (*Id.* at 457-58.) She reported daily headaches, "a lot of light sensitivity," and visual distortion similar to migraines, as well as light headedness and near syncope. (*Id.* at 457.) A recent brain MRI continued to show

abnormal white matter T2 signals but was otherwise unchanged. (*Id.* at 457-48.) She was prescribed Zoloft for anxiety and migraines, and was instructed to take Advil or Aleve for pain. (*Id.* at 458.)

On November 20, 2017, Dr. Kovoor referred Plaintiff to FitSTEPS for Life (FitSTEPS) for cancer exercise rehabilitation. (*Id.* at 852.) On November 27, 2017, Dr. Reihsen cleared her to participate in a "light to moderate exercise program." (*Id.* at 853.) She attended exercise sessions at FitSTEPS from December 2017 to April 2019. (*Id.* at 854-55.)

On December 13, 2017, Plaintiff presented to Dr. Beitsch for a breast cancer follow-up. (*Id.* at 356.) She reported pain under her left arm but doing well with left breast DCIS. (*Id.*) Dr. Beitsch assessed Plaintiff with malignant neoplasm of upper-outer quadrant of left breast, localized swelling of right upper limb, and fibroadenosis of the right breast, and she was continued on hormonal therapy. (*Id.*)

On December 18, 2017, Plaintiff returned to Dr. Hopson. (*Id.* at 454-55.) She reported feeling "much better overall" with no dizziness, light headedness, or further neurological symptoms. (*Id.* at 454.) She was instructed to call if her symptoms changed. (*Id.* at 455.)

On February 27, 2018, a bilateral breast MRI showed the lumpectomy site was stable with no evidence of malignancy in either breast or axilla. (*Id.* at 547.)

On March 5, 2018, Kim Rowlands, M.D., a state agency medical consultant (SAMC), completed a physical Residual Functional Capacity (RFC) assessment based on the medical evidence. (*Id.* at 81-83.) She opined that Plaintiff could lift and/or carry 50 pounds occasionally and 20 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit more than six hours in an eight-hour workday; push and/or pull without limitations, other than shown for lift and/or carry; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and

occasionally balance, stoop, kneel, crouch, and crawl, with no postural, manipulative, visual, or communicative limitations. (*Id.* at 82.) Plaintiff must avoid even moderate exposure to hazards, but she did not have other environmental limitations. (*Id.* at 82-83.) Dr. Rowlands determined that Plaintiff's alleged severity of symptoms was partially consistent with the evidence of record. (*Id.* at 81.) SAMC Leigh McCary, M.D., generally affirmed Dr. Rowlands' physical RFC assessment on August 17, 2018, except she opined that Plaintiff could only lift and/or carry 20 pounds occasionally and 10 pounds frequently. (*Id.* at 94-97.)

On March 12, 2018, Plaintiff presented to Trent Pettijohn, M.D., with hypertension and hyperlipidemia. (*Id.* at 568-70.) She reported occasional palpitations and rare chest tightness with emotional stress. (*Id.* at 569.) Dr. Pettijohn noted that she had previous negative coronary computed tomography angiography and coronary calcium scan, but her symptoms of chest tightness were atypical. (*Id.*)

On March 28, 2018, an abdomen ultrasound showed multiple liver hepatic cysts and evidence of mild hepatic steatosis. (*Id.* at 990.)

On April 30, 2018, Plaintiff returned to Dr. Reihsen with leg pain, dizziness, headaches, and high cholesterol. (*Id.* at 887-88.) She reported that her vertigo continued with no change, and that she was still having headaches and dizziness. (*Id.* at 887.)

On May 9, 2018, Plaintiff's cancer exercise trainer, Pam Patrick, ACSM, provided a letter stating that her medical condition "seriously impacted her both physically and mentally which prohibited her from working at this time." (*Id.* at 522.)

A brain MRI on May 24, 2018, showed numerous hyperintense lesions in the cerebral white matter, but no acute intracranial abnormality or intracranial metastatic disease. (*Id.* at 767.)

On July 5, 2018, Plaintiff presented to Sabrina Stone, M.D., for a cardiology appointment. (*Id.* at 564-68.) She reported feeling light headed, dizzy, weak, and tired, and left arm pain, daily headaches, and fluctuating blood pressure. (*Id.* at 564-65.) She was prescribed propranolol for blood pressure. (*Id.* at 564.)

On July 10, 2018, Plaintiff presented to NP Steve Gallaway with mixed hyperlipidemia, elevated blood pressure, dizziness, palpitations, and chest tightness. (*Id.* at 559-61.) She reported having some difficulty with headaches, dizziness, and variable blood pressure. (*Id.* at 559.) Her systolic number would reach the 150s, and she would feel worse when her blood pressure was elevated. (*Id.*)

On July 24, 2018, Plaintiff returned to NP Gallaway with complaints of dizziness, fatigue, and some chest tightness. (*Id.* at 555-56.) NP Gallaway noted that she continued to have variable blood pressure, and opined that a component of her symptoms was related to anxiety. (*Id.* at 556.)

On February 27, 2019, a diagnostic mammogram showed a benign post-operative change at the lumpectomy site in the left breast with no evidence of malignancy. (*Id.* at 795.)

On August 23, 2019, Dr. Pettijohn provided a medical source statement. (*Id.* at 1049-52.) He noted that Plaintiff had a history of hyperlipidemia, palpitations, chest tightness, and dizziness, with worsening symptoms since 2016. (*Id.* at 1049.) He opined that she could sit for one hour at a time and six hours total in an eight-hour workday, and stand/walk 10 minutes at a time and less than two hours total in an eight-hour workday. (*Id.*) She would sometimes require unscheduled breaks during the workday due to dizziness and pain. (*Id.* at 1050.) Dr. Pettijohn opined that she could rarely lift up to 10 pounds and never lift more than 20 pounds; that she could rarely twist, stoop, crouch/squat, and climb stairs and never climb ladders; and that she could be expected to be off task 10% of the

workday. (*Id.*) He also opined that she was capable of low stress work and could be expected to be absent from the workplace more than four days per month. (*Id.* at 1052.)

**C.     Hearing**

On July 24, 2019, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 34-74.)  Plaintiff was represented by an attorney. (*Id.* at 36.)

### 1.     *Plaintiff's Testimony*

Plaintiff testified that she last worked in 2015 and recently had been applying for a variety of jobs. (*Id.* at 44-45.) She had surgery for breast cancer in April 2016, and then started radiation a month later, which continued for approximately three months. (*Id.* at 46-47.) During that timeframe she experienced "incredible exhaustion" and had great difficulty doing simple daily activities, like showering and washing and drying her hair. (*Id.* at 47.) Her extreme fatigue grew progressively worse throughout treatment and continued for awhile after she finished radiation. (*Id.*) She started Tamoxifen treatment around early 2017, but had to stop the medication because of nausea, muscle pain, pain in the legs and arms, and an overall feeling of not being well. (*Id.* at 48.) Her symptoms began to dissipate after the Tamoxifen treatment was discontinued, but she continued to have some of the symptoms. (*Id.* at 48-49.)

Plaintiff experienced dizziness three times per week, where she would feel dizzy, lightheaded, unable to stand very long, and fearful of fainting. (*Id.* at 50.) She had passed out before, but it was a long time ago. (*Id.* at 50-51.) She was prescribed propranolol for blood pressure and would take it when she felt dizziness symptoms coming on. (*Id.* at 51.) She experienced two migraine episodes per month, where she would need to drink lots of water and lie down in a dark room with a compress for about an hour. (*Id.* at 52.)

When not experiencing dizziness, she could walk a maximum of 15 minutes and then would need to sit for five to six minutes due to fatigue and muscle weakness. (*Id.* at 53-54.) She could stand for 10 to 15 minutes and could sit up to 30 minutes before having issues with stiffness. (*Id.* at 54.) She could carry light items around the house and would be able to carry a gallon of milk across a room. (*Id.* at 54-55.) She did light household chores, like prepare meals, do laundry, and wash dishes, but avoided driving because everything would start to spin. (*Id.* at 56.) She would take Lorazepam after experiencing an anxiety attack, and she estimated having one strong episode and two to three lesser episodes a week, with each episode lasting 45 minutes. (*Id.* at 58, 64.) During an anxiety attack, she would do breathing exercises, drink water, and try to mentally work on calming herself down. (*Id.* at 58.) Since December 2017, she had been walking very slow due to low energy and fear of falling from a dizzy spell. (*Id.* at 60.) She would have one non–migraine headache episode per week that could last a couple of hours and that was not as intense as a migraine, but would still limit her activities. (*Id.* at 62.)

Dr. Pettijohn was her cardiologist, and she began seeing him when she started having chest pains and an irregular heartbeat. (*Id.*) She was able to perform a stress test on a treadmill but needed some support because of her dizziness. (*Id.* at 63.)

### 2.    *VE's Testimony*

The VE testified that Plaintiff had previous work experience as a marketing account director, which was sedentary work but performed as medium with an SVP of 8; as a procurement services manager, which was sedentary work but performed as medium with an SVP of 7; as a marketing manager, which was sedentary work with an SVP of 8; and as a vice president, which was sedentary work with an SVP of 8. (*Id.* at 65-66.) A hypothetical person with the same age, education, and

11

work experience history as Plaintiff, who could perform light work; occasionally climb ramps or stairs but never climb ladders, ropes or scaffolds; occasionally kneel, stoop, crouch, and crawl; ocassionally balance on level surfaces but never balance on narrow or moving surfaces; never work at unprotected heights, around dangerous moving machinery, operate motorized vehicles or equipment, outdoors in bright sunshine, or with bright or flickering lights; could perform her past work as an advertising manager and a vice president. (*Id.*) She could also perform light, SVP-2 level work, including as a small products assembler with 62,000 jobs nationally, a hand packer with 160,000 jobs nationally, and an electronics worker with 67,000 jobs nationally, all of which were consistent with the Dictionary of Occupational Titles (DOT). (*Id.* at 67-69.) If limited to work with no pace requirements, she could not perform any of her past work. (*Id.* at 68.) She would not have acquired any skills from her past work that would be transferable to work that was further limited to the sedentary exertional level. (*Id.* at 69.) A person that could walk only at a slow pace no more than 15 minutes at a time, stand no more than 10 minutes at a time, and sit no more than 30 minutes at a time; required an additional two-hour break twice a month to lie down; and would miss four workdays a month for medical appointments, would be precluded from competitive employment. (*Id.* at 71-72.)

**D.    ALJ's Findings**

The ALJ issued a decision denying benefits on September 25, 2019. (*Id.* at 14-27.) At step one, she found that Plaintiff had met the insured status requirements through December 31, 2018, and had not engaged in substantial gainful activity since the alleged onset date of February 2, 2016. (*Id.* at 16.) At step two, the ALJ found that she had the following severe impairments: stage 1 breast cancer, cervical degenerative disc disease, migraine headaches, hypertension, anxiety, and major

depressive disorder. (*Id.*)  Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 17.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations: lift and carry up to 20 pounds occasionally and 10 pounds frequently; walk and stand, in combination, six hours of an eight-hour day; sit six hours of an eight-hour day; push or pull commensurate with lifting restrictions; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally kneel, crawl, crouch, or stoop; occasionally balance on level surfaces, but never balance on narrow or moving surfaces; never perform any work at unprotected heights, outdoor work in bright sunlight, or work around bright or flickering lights, such as would be experienced in welding or cutting metals, or work that requires maintaining a production-rate pace, such as assembly-line work; never work around dangerous moving machinery; and never operate commercialized vehicles or equipment. (*Id.* at 20.)  At step four, the ALJ determined that Plaintiff was unable to perform her past work.  (*Id.* at 25.)  At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 26.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from February 2, 2016, through December 31, 2018, the date last insured. (*Id.* at 27.)

## II.  STANDARD OF REVIEW

13

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

14

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational

testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.    The Plaintiff was found to have breast cancer in March 2016, submitted to surgery, followed by a course of radiation therapy. She was then placed on chemotherapy, which she had to discontinue because of adverse side effects, 2 days short of the anniversary of her partial mastectomy. The ALJ found that a closed period of disability was not warranted, relying upon the opinion of a physician issued in November 2017. But this was 21 months after the Plaintiff's alleged onset date of disability. Did the ALJ properly determine that the Plaintiff was not eligible for a closed period of disability, while relying on a statement issued more than 21 months after the date of alleged onset of disability?

The Plaintiff submits that the answer is "No."

2.    The ALJ found that the Plaintiff has severe impairments. Among these severe impairments is migraine headaches. The ALJ maintained that she accommodated for Plaintiff's migraine headaches by limiting her from performing work activities in bright sunshine or around bright or flickering lights. But there is no indication that the Plaintiff has ever been exposed to bright or flickering lights, or that she has been working outdoors in bright sunshine, yet she continues to experience migraine episodes. Accordingly, the restrictions which the ALJ included in her residual functional capacity (RFC) determination have no relevance to the Plaintiff's medical condition. Did the ALJ properly accommodate the Plaintiff's migraine headaches in determining her RFC?

The Plaintiff contends that the answer is "No."

3.    A medical source statement was issued by the Plaintiff's treating cardiologist, finding that she is limited to less than a full range of sedentary work and would be absent from work more than 4 days per month. The vocational testimony establishes that this degree of absenteeism would preclude the Plaintiff from engaging in substantial gainful activity. The ALJ found that the opinion of the treating cardiologist was generally, but not wholly consistent with the longitudinal record. The ALJ maintained that

cardiac testing has not established coronary artery disease which would support the limitations indicated by the treating cardiologist. But the doctor reported that in addition to palpitations and chest tightness, the Plaintiff also suffers from dizziness, and that dizziness causes the Plaintiff to require unscheduled breaks during the course of the workday. The record establishes that the Plaintiff has had consistent neurological evaluation and treatment for her complaints of dizziness. Did the ALJ properly discount the opinion of the treating cardiologist, who rendered his opinion as to Plaintiff's functional ability based upon a neurological condition?

The Plaintiff maintains that the answer is "No."

4.      The ALJ found that the Plaintiff cannot return to her past relevant work. At step 5, the burden shifted to the Commissioner to establish the existence of other work, in significant numbers, which the Plaintiff can perform. In response to a hypothetical question, the vocational witness (VE) described unskilled work at the light exertional level. The ALJ found that the Plaintiff can perform such work. However, the jobs relied upon by the ALJ are currently classified as requiring more than 30 days of training, which exceeds the unskilled level. Yet, the ALJ did not identify skills which the Plaintiff may possess which are transferable to such work. Did the ALJ establish that the Plaintiff can perform alternative work which exists in significant numbers?

The Plaintiff asserts that the answer is "No."

(doc. 17 at 2-3.)

## IV.  RFC ASSESSMENT[4]

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

(doc. 17 at 9.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical

assessment of an applicant's impairments with descriptions by physicians, the applicant, or others

of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th

---

[4]Because Plaintiff's RFC impacts whether she is eligible for a closed period of disability, the RFC assessment issue is addressed first.

Cir. 1988) (per curiam).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a

18

"conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations: lift and carry up to 20 pounds occasionally and 10 pounds frequently; walk and stand, in combination, six hours of an eight-hour day; sit six hours of an eight-hour day; push or pull commensurate with lifting restrictions; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally kneel, crawl, crouch, or stoop; occasionally balance on level surfaces, but never balance on narrow or moving surfaces; never perform any work at unprotected heights, outdoor work in bright sunlight or work around bright or flickering lights, such as would be experienced in welding or cutting metals, or work that requires maintaining a production-rate pace, such as assembly-line work; never work around dangerous moving machinery; and never operate commercialized vehicles or equipment. (doc. 14-1 at 20.)

## A.   *Ripley*

Plaintiff argues that the RFC is not supported by medical opinion evidence because the limitations imposed by the ALJ to accommodate migraine headaches have not been shown to have any relevance to her migraine episodes. (doc. 17 at 9.) The Commissioner responds that substantial evidence supports the ALJ's RFC assessment. (doc. 18 at 5-6.)

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. The Fifth Circuit noted that although

an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp.2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

Here, the ALJ did not explain how she determined that Plaintiff could not work outdoors in bright sunshine or around bright or flickering lights that might be experienced in welding or cutting metals. (*See* doc. 14-1 at 20.) She considered Plaintiff's longitudinal medical records, which noted that she had migraine headaches. (*Id.* at 24-25.) She also referenced Dr. Hopson's clinical notes on December 18, 2017, finding her brain MRI "abnormal," diagnosing her with migraine headaches, and prescribing her medication to treat migraine headaches. (*Id.* at 25.) None of that medical evidence addressed the effects of her physical conditions on her ability to work, however. *See Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003) (finding that notwithstanding a vast amount of treating source medical evidence in the record,

including voluminous progress reports, clinical notes, and lab reports, which showed that plaintiff suffered from certain impairments, none of the evidence made "any explicit or implied reference to effects these conditions h[ad] on claimant's ability to work", and the ALJ could not rely on that "raw medical evidence as substantial support for" the claimant's RFC). While Plaintiff complained of "light sensitivity" when she visited Dr. Hopson for her migraines, "evidence which merely describes [a claimant's] medical conditions is insufficient to support the ALJ's RFC determination." *See Turner v. Colvin*, No. 3:13-CV-1458-B, 2014 WL 4555657, at *5 (N.D. Tex. Sept. 12, 2014) (citing *Ripley*, 67 F.3d at 557).

The ALJ also considered Dr. Pettijohn's medical source statement of Plaintiff's physical ability to perform work related activities. (doc. 14-1 at 24.)  Dr. Pettijohn opined, in relevant part, that Plaintiff would sometimes require unscheduled breaks during the workday due to dizziness and pain, and she could be expected to be absent from the workplace more than four days per month due to her impairments. (*Id.* at 1050, 1052.) The ALJ noted that Dr. Pettijohn provided no objective clinical records to support Plaintiff's expected monthly absences, and found his opinion "less persuasive." (*Id.* at 24-25.) While the ALJ may choose to reject Dr. Pettijohn's opinion, "[s]he cannot independently decide the effects of Plaintiff's ... impairments on [her] ability to work, as that is expressly prohibited by *Ripley*." *Shugart v. Astrue*, No. 3:12-CV-1705-BK, 2013 WL 991252, at *5 (N.D. Tex. Mar. 13, 2013).

There are no medical opinions in the record regarding the effects that Plaintiff's migraines and light sensitivity had on her ability to work, so the ALJ appears to have relied on her own interpretation of the medical and other evidence, which she may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not–without the opinions from medical

experts–derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ-a layperson-may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

B.    <u>Harmless Error</u>

      Because "[p]rocedural perfection in administrative proceedings is not required" and a court

"will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that she is not disabled. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC); *see also Thornhill v. Colvin*, No. 14-CV-335-M, 2015 WL 232844, at *11 (N.D. Tex. Dec. 15, 2014) (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"), *adopted by* 2015 WL 232844 (N.D. Tex. Jan. 16, 2015). Accordingly, the error is not harmless, and remand should be required on this issue.[5]

## V.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED**

---

[5]Because this error requires remand, and determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed here.

for further proceedings.

**SO RECOMMENDED**, on this 7th day of March, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE